TALKIN, MUCCIGROSSO & ROBERTS, L.L.P.
ATTORNEYS AT LAW
40 EXCHANGE PLACE
18TH FLOOR
NEW YORK, NEW YORK 10005

(212) 482-0007 PHONE
(212) 482-1303 FAX
WWW.TALKINLAW.COM
EMAIL: INFO@TALKINLAW.COM

MARYLAND OFFICE:
5100 DORSEY HALL DRIVE
SUITE 100
ELLICOTT CITY, MD 21042
410-964-0300

NEW JERSEY OFFICE:
2500 PLAZA 5
HARBORSIDE FINANCIAL CENTER
JERSEY CITY, NJ 07311
201-342-6665

December 22, 2022

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

BY ECF & EMAIL

            Re: United States v. Tomer Osovitzki
               19 Cr. 794 (KPF)

Dear Judge Failla:

  Defendant Tomer Osovitzki ("Osovitzki") respectfully submits this letter as a Sentencing Memorandum for the Court's consideration in determining his appropriate and reasonable sentence. Defendant does not object to the United States Sentencing Guidelines ("Guidelines") calculation set forth in the Presentence Investigation Report ("PSR"). For all the reasons set forth in detail below, defendant respectfully submits that a sentence that does not include any additional incarceration[1] is sufficient, but not greater than necessary, to satisfy the sentencing goals set forth in 18 U.S.C. § 3553 and is appropriate in this case.

## **INTRODUCTION**

  Osovitzki has pled guilty in this case and is taking full responsibility for his actions. As he writes in his letter to the Court, "I am sorry for the harm that I have caused my family and loved ones, but most of all I am sorry to those clients and vendors I hurt with my criminal conduct."[2] His actions in this case were aberrant from both the personal and professional behavior he exhibited prior to the offense conduct, a period in which he possessed and exhibited

---

[1] Osovitzki was incarcerated from May 23, 2019 to June 3, 2019, a period of twelve days, at FDC Miami

[2] Osovitzki's letter is attached as Exhibit A.

a strong work ethic and integrity.[3] Additionally, the fraud perpetrated by defendant includes several unique mitigating circumstances, including the repayment of many victims prior to Osovitzki's knowledge that a criminal investigation had commenced and a motivation other than personal enrichment.

For almost two decades, Osovitzki worked his way up the ranks and eventually became the CEO of his family's profitable and successful travel agency, CTMS Travel Group ("CTMS"), first located in Toronto and later headquartered in Miami with several additional international offices. Under Osovitzki's stewardship, CTMS expanded from servicing personal leisure travel to handling corporate accounts and coordinating business travel, a major enlargement of the both the company's services and its profitability. After the business moved to Miami, the company also began to receive an increasing number of requests for private flights, largely from celebrity clients. Seeing a business opportunity and to some extent seduced by the allure of associating with stars in sports and entertainment, Osovitzki transitioned away from CTMS travel services and opened a new private jet brokering service called Jetlux, Inc. ("Jetlux") under the CTMS umbrella.

Unfortunately, Osovitzki turned out to be ill-prepared both personally and professionally for this new endeavor. On a personal level, Osovitzki had grown up in a traditional Jewish family in Toronto, spending only a couple years in college as a commuter student, marrying in his early twenties, and becoming a father shortly thereafter. His early adulthood was straightlaced. He had no experience with drugs and the partying lifestyle, let alone on the scale of extravagance prevalent in the celebrity world. Professionally, Osovitzki had worked at a high level in the travel industry for some time, but he had never built his own company from the ground up and was naïve to the complexities of the business world surrounding celebrities. The combination of these two shortcomings, compounded by a series of desperate and poor choices—for which Osovitzki now expresses extreme remorse—to remedy a business predicament of his own making resulted in a previously law-abiding citizen committing the criminal conduct Osovitzki has now admitted.

In short order, Osovitzki developed a serious substance abuse problem. At the same time, Jetlux struggled to meet the needs of its famous clientele. Many of Jetlux's important clients requested and expected gratuities and favors. Osovitzki, aiming to please and develop his business, agreed to numerous deals in which he gave out free flights in exchange for the promise of future business or influential social media marketing. These promises made to Osovitzki were often not kept and the benefits to Jetlux Osovitzki had hoped for therefore did not materialize. Both star-struck and hoping for celebrity endorsement, Osovitzki also regularly agreed to payment terms favorable to clients, which caused critical cashflow issues for Jetlux. Because of these colossal business mistakes and Osovitzki's drug-affected lack of attentiveness to his company, Jetlux became overextended with flights promised to clients but no way to deliver because the company was unable to pay the flight operators. Rather than doing the right thing and looking for legitimate credit or admitting that the business was defunct, Osovitzki instead made the very wrong and very regrettable decision to misuse credit cards in a misguided attempt

---

[3] The word "aberrant" is used here in the colloquial sense, and defendant does not contend that he is entitled to, or meets the requirements for, an "Aberrant Behavior" downward departure as set forth in Guidelines § 5K2.20.

to extend himself a line of credit, or a float, to keep his business solvent. Unfortunately, in many instances, Osovitzki compounded his original misuse of the credit cards with further lies to his creditors about when and how they would be repaid to (improperly) buy himself time to obtain the funds to pay them back.

Osovitzki (wrongly) justified his conduct to himself with the assumption that he would be able to pay back the credit card holders, agencies, and flight operators in short order when receivables came into the company and with his own money. When he realized his business debts were too great to be covered by company revenue, at least in the short term, Osovitzki began to liquidate personal assets, including property, vehicles, savings accounts, and stocks (a large portion of the assets he had accumulated during this career at CTMS) and took mortgages and other lines of credit secured by his home and other personal property and used the money he obtained to pay Jetlux's creditors. Most of the victims in this case were repaid in a matter of weeks or months in late 2017 or the first half of 2018; well before Osovitzki's May 2019 arrest. As a result, the fraud scheme at issue in this case involves the unique circumstance that most of the victims were made whole a year or more before Osovitzki became aware of the criminal investigation. In other words, Osovitzki's actions confirm that, though his conduct was criminal and wrongful, he had always intended to pay back his creditors, irrespective of any awareness of legal jeopardy, and he largely succeeded in making these repayments.

Moreover, Osovitzki's criminal conduct was not intended to and did not enrich him personally. Even in the short term, Osovitzki made no money from Jetlux; instead, he was forced to liquidate his own assets to try to keep the company afloat. And in the long run, the company failed, Osovitzki incurred both criminal and civil legal costs, and, in addition to restitution, he owes $3,120,996 in forfeiture of ill-gotten "gains" that he never personally benefited from at all.

In the three and a half years that have elapsed since Osovitzki's arrest, he has returned to his previous law-abiding and sedate lifestyle. Though it took some effort, Osovitzki used counseling and therapy to quit using drugs. And he has returned his focus to the role he cherishes as a father of four daughters, who look up to and revere their father. He has also reconnected with his Jewish spirituality and undertaken numerous rewarding charitable efforts. Osovitzki has already demonstrated to the Court through his actions and words that he is rehabilitated, and is not a threat to recidivate. This rehabilitation is also corroborated by the many letters of support from family members, friends, members of Osovitzki's community and the Aleph Institute.[4]

## OSOVITZKI'S PERSONAL BACKGROUND

A. Childhood In Canada

Osovitzki is 45 years old. PSR ¶ 73. He was born and raised in Toronto, the son of Yair and Galia Osovitzki, Israeli immigrants to Canada. *Id.* He has one younger brother, who still lives in Toronto, with whom he remains very close. PSR ¶ 74. In his childhood, Osovitzki's father

---

[4] Letter of support from family and friends are attached collectively as Exhibit B.

owned a limousine business, and his mother co-owned a travel business with her brother. PSR ¶ 73, 75. Osovitzki's family has always been and remains close-knit. PSR ¶ 73. Osovitzki recalls celebrating all of the Jewish holidays and traditions with his extended family, and these celebrations are some of his fondest memories of his early years. PSR ¶ 73. From a young age, Osovitzki's parents instilled in him the values of hard work and diligence as well as the spirit of entrepreneurship.

Osovitzki was raised in a traditional, middle-class family. His mother, Galia, describes Osovitzki's childhood as one of comfort in the suburbs of Toronto. As she notes in her letter, Osovitzki was always warm and stood out even as a child for the way he "care[d] for his grandparents, parents," and elders generally. She notes that "drugs and alcohol" were never an issue of concern for her as a parent to Osovitzki and that "we didn't have any issues raising him as a child or in his teenage years . . . We never had any issues with teachers or counselors." Rather, Osovitzki "was always an independent and hardworking individual since his youth . . . he loved working." Osovitzki's father, Yair, concurs, recalling that Osovitzki, at ten, "used to clean and do other chores" while the parents worked, and "[i]n his teenage years after school hours and on weekends Tomer helped us with our new travel business." Osovitzki's uncle, Jacob Asif, writes that Osovitzki was "always my pride and joy . . . a wonderful child, a good heart[ed] boy [who] matured as an honest[,] loyal man." Galia's cousins, Joseph and Rika Sernlib recall that "[h]e grew up with a loving family . . . [a]s a kid, he was very smart with a big smile and a big heart." A distant family member, Zvia Levy, writes that she and her family "immigrat[ed] to Canada at what was a low point in our lives . . . struggling financially, hoping for a better future, trying to set up a business from scratch." She recalls that Osovitzki "spared no effort and missed no opportunity to extend both practical and moral support. . . . We were [] distant family members, who were neither young and 'cool' nor rich, yet at our time of need, at a time [when] teenagers occupy themselves exclusively with their own needs and wants, Tomer was there for us." Tzvi Snir shares a similar story of immigrating to Canada and meeting Osovitzki when both were 15 years old and how much it meant to Snir that Osovitzki was "warm and welcoming" and helped him through "a very difficult time adjusting to my new life in a brand new country."

While still in secondary school, Osovitzki began working with his parents, who were always entrepreneurial. PSR ¶ 76. In his early adolescent years, his parent started a short-lived wholesale clothing business, and Osovitzki worked there. *Id.* After that, he worked a series of jobs including newspaper delivery and scooping ice cream. *Id.* At about the time he turned 17, Osovitzki' s parents started CTMS, their successful travel management company. *Id.*

B. Married Life And Career At CTMS

After high school, Galia and Yair moved the family for a brief time to Israel. Osovitzki, went for a year to Bar Ilan, a public research university in Ramat Gan, a suburb of Tel Aviv. In 1997, while a student at Bar Ilan, Osovitzki met his future wife, Sharon, a 19-year-old from Dallas who was also a student at Bar Ilan. Sharon writes that although "he was only 19 at the time, Tomer was a very mature, responsible, and good-hearted man that was extremely kind and caring to everyone." She recalls that Tomer often would forgo socializing with his peers to spend time with his grandparents and other family members. A few years later, at twenty-four, Osovitzki and Sharon married. Soon after, Osovitzki and his wife became parents to a daughter; by age 27

Osovitzki was a parent of two girls, and in the years that followed the couple had two more daughters. As discussed in more detail below, Osovitzki has throughout the years been what Yair calls a "caring and lov[ing] father to his 4 beautiful girls that adore him."

In 1998, Osovitzki went to Dallas and lived with Sharon for a few months before returning to live with his parents, who were now back in Canada. Osovitzki attended York University in Toronto, several miles from his home, and studied business management for about a year. PSR ¶ 92. Though he was a good student, Osovitzki left school in 1998 and went to work for his parents' company, CTMS, full time. He quickly rose through the ranks of the company. Galia recalls that Osovitzki had "a vision to open a corporate [division] to our leisure and tours agency." Osovitzki would work at CTMS for the next eighteen years, "earn[ing] the title of CEO with [an] extremely demanding work [] schedule. He worked directly with the clients and the VIP's of the corporations." Under his stewardship, CTMS flourished, eventually earning inclusion in the Profit 500 ranking of Canada's fastest growing companies in *Canadian Business* magazine and being awarded the "Circle of Excellence" Award from Air Canada. Sharon writes that Osovitzki "took a lead in building a family business that started as a very small leisure travel agency" and that "he succeeded greatly in growing a solid travel management company that was his pride and joy." Galia notes that neither Osovitzki nor CTMS had any legal issues during his nearly two decades at the company despite the considerable regulation that CTMS was under as part of the heavily regulated travel industry. The company achieved its greatest level of success with Osovitzki at the helm, developing important new business relationships and maintaining existing ones. Working in the travel industry was a natural fit for the "people-pleaser" side of Osovitzki's personality. As Sharon noted, "[h]e always liked to fulfill the needs of everyone and made sure everyone was happy."

In his own letter to the Court, Osovitzki talks about the pride he took in his accomplishments at CTMS. "With my hard work and dedication to [existing clients,] they began to refer me to corporations, which gave me new opportunities and now I found myself managing large corporate travel programs." Osovitzki enjoyed the successful growth of the company and notes that he was "respected in the industry for my professionalism, honesty, and dedication [to the] staff[,] clients, and vendors."

In 2007, Osovitzki and his wife moved to Florida to join his parents, who had already made the move. As Yair recalls, the family was "looking for" a "weather change." Osovitzki notes that at the time, "[o]ur business in Canada was running smoothly," and he now took on the challenge of "building the foundation of a US office," while still regularly traveling back to Canada to maintain business operations in Toronto. Galia recalls that in Florida the family "hire[d] agents from our circle of friends" with whom they already had a measure of "trust." As with the Canadian business, Galia writes that the US location was a "great success," and that CTMS eventually grew to have six offices globally by 2016, including offices in the US, Canada, and the UK.

One of the great joys for Osovitzki was that CTMS truly was a family business, employing not only his parents, his brother, and him but also many other friends and relatives. Many of them have written letters of support. Osovitzki's uncle, David Beitan, writes that he was Osovitzki's employee at CTMS for 10 years as an IT manager and that Osovitzki "always treated everyone who work[ed] for the company with respect and walked the extra mile to ensure that everyone

[was] happy at their job." Osovitzki's aunt, Nitza Betan, joined CTMS when it was founded as a Quality Assurance Manager and writes that Osovitzki was "a young man who took a big load on his shoulders" and someone with whom she "enjoyed working . . . and felt that things were going smoothly when he is around." Nitza Betan recalls that Osovitzki "always worked hard and had a positive outlook." Sharon's cousin, Noam Ben-Uzi, worked under Osovitzki "for about 3 years, as the chief technology officer of CTMS Travel" and recalls that "[w]orking for Tomer was always a pleasure" and that "it was clear how much he cared about his customers" because he was constantly discussing "ideas for the business" and "about how we could better serve" the clients. Sharon Portmann, Osovitzki's aunt, "joined Tomer when he started to build his new company" in 2006 and recalls that he "was hard working, passionate, and very devoted to ensuring that his company grow" by "going above and beyond for his clients." She remarks that Osovitzki "was never able to say no to anyone, he always wanted to please and make sure everyone was happy."

Several non-familial employees have also written letters of support discussing their admiration for Osovitzki when he ran CTMS. Robby Anthony writes that Osovitzki was "always [] extremely understanding and compassionate to his employees" and made a point of making himself "accessible" and let employees "know that they are important and that their voices and feelings really matter" even though he was busy running "a multinational company with offices in the United States, Canada and the UK." Anthony also admired Osovitzki's commitment "to being a father and the importance of faith." Similarly, Sonia De Los Santos, a former employee, recalls "witness[ing] the long hours of dedication to his clients" as well as Osovitzki's being "an amazing dad [a]nd a loving husband." Rami Barghouti, whose sister worked for CTMS, writes that "Tomer's leadership and level of support to others is truly rare, leading with integrity and empathy are the values that resulted of years of long personal and professional relationships with friends, employees, colleagues, and clients." Another former coworker, Suzy Ronen, write that Osovitzki is "extremely warm-hearted, friendly, kind, polite, respectful, and hardworking."

Perhaps the most telling account a colleague comes via Veronica Domb, who writes about arriving to Canada in 2004 as an immigrant in search of a job. She "randomly walk[ed]" into Osovitzki's office, and instead of turning her away, he interviewed her twice and then hired her. Domb writes that she "worked closely with Tomer as his assistant and a travel agent, spending over 10 hours working together 5-6 days per week" and "[w]itnessing Tomer fulfill his purpose of serving and helping others, making a significant impact on the lives of the people around him and the lives of the clients her served." Unfortunately, Osovitzki has now tarnished much of the professional reputation in which he took so much pride and will have to work to rebuild it.

C. Expansion Into Private Flight Business, Substance Abuse Issues, And Arrest

In 2016, Osovitzki writes that CTMS "had 6 offices globally and . . . was running smoothly [with] over 100 employees . . . clientele [that] was prestigious" and had a solid business foundation in which clients paid on time and the business was relatively risk-free. Osovitzki notes that clients began to "request[] private jets," and he "decided to expand our company [to] have a division which dealt solely" with private flights "to mostly service our existing clientele." But shortly after founding Jetlux, Osovitzki found that the company began to attract celebrities both from the world of sport and also from Hollywood. Osovitzki describes himself at the time as "naïve[,] oblivious and mostly 'blinded by the limelight.'"

In short order, Osovitzki began to make a series of extremely misguided decisions, which he compounded with further bad judgment. Among the most serious mistakes was experimenting with drugs and excessive drinking. Osovitzki writes,

> I [had] never 'partied,' I met my wife at age 19, got married at age 23, [and became a parent shortly thereafter]. My [] definition of success was having [a] stable income, married with kids and [a] happy home. In a matter of 18 months[,] I managed to ruin everything around me[.] I had resorted to heavy drug use [] often in the presence of big Hollywood names and I neglected my true moral values, and it was at this time that I began misusing credit cards. . . . My family saw that I was uncontrollable, my wife told me to leave the house, my parents [] fired me from the business, my entire circle of family and friends [were] fighting to save me.

Galia, who has been in the travel industry for almost fifty years, recalls being wary of the direction that both her son and his division of the company were going. She writes that she was suspicious of the social media and celebrity attention Jetlux was receiving as her "mind was telling me that something is not right." Soon she saw Osovitzki hanging out with clients and "giving these people flights without paying upfront," a business practice foreign to the way that CTMS had operated. She witnessed as the freebies and advances Osovitzki handed out "emptied the company [of its] cashflow." At the same time, she noticed that Osovitzki appeared to have a substance-abuse problem, recalling that she "felt as if I 'lost' my son." First, the company "had to let some good hard-working people go." And eventually, "[a]fter 20 years of hard work, Tomer was fired from CTMS."

While he was losing his professional reputation, Osovitzki also nearly lost something even more important to him, his family. Sharon recalls, "[t]here was drinking and there were drugs, which led to erratic behavior and months without seeing him." Despite a marriage of almost twenty years, Sharon felt that she had no choice but to kick Osovitzki out of the house and separate from him.

The criminal conduct alleged in this case occurred during a roughly eighteen-month period in 2017 and 2018. Having fallen behind in his ability to supply flights he had pledged to clients, Osovitzki began to misuse credit cards, including his own, his mother's, his wife's, and those of his clients. PSR ¶¶ 21-44. He was desperate. In his mind, he justified his actions as taking a unilateral line of credit that he would use to preserve his business and pay off in short order. He writes, "My fraud was to save the business and the employees, I am by no means excusing myself, merely [] trying to explain the story." Almost immediately, Osovitzki began to sell off his own assets and to take out legitimate credit in his own name to pay back the credit card holders. He writes, "Knowing what I did was wrong[,] I took actions to sell all my assets and mortgage my home to pay the vendors or credit card [holders]. . . My family[s'] assets . . . were promptly used to pay any creditor." The PSR recounts various instances in which Osovitzki misused a credit card to pay for a flight or series of flights and then reimbursed in a matter of weeks or months either the customer whose card was misused or the operator if the charge was declined. PSR ¶¶ 21-44. In the process, Osovitzki sold off real estate he owned in Florida and multiple vehicles and took out mortgages on other property. Galia also writes that Osovitzki "had to sell his three properties

in Toronto and [empty] all his savings [to] pay the victims one by one until the situation became a little better." Sharon writes that "[w]e had significant assets that we had built, and almost everything was sold off to achieve restitution. It was tremendously difficult to make that decision, but it was important to Tomer." These repayments occurred in late 2017 and throughout 2018, long before Osovitzki became aware of the criminal investigation that culminated in the charges to which he pled guilty.

Osovitzki's long-time civil attorney and friend, Manny Tarich, handled many of legal disputes and repayments that came out of the conduct at issue in this case. Tarich writes that Osovitzki:

> insisted that under no circumstances would he or his company file for bankruptcy and that each person or company that was owed money would be repaid. From 2018 through the time of his arrest we worked tirelessly to make sure that each [victim] was paid back the monies they were owed. I would estimate that in that time 85-90% of those owed money were in fact paid back.

After he was arrested, Osovitzki heeded the advice of his prior criminal counsel and stopped making repayment. More recently, Osovitzki has again reached out to the remaining victims and sought to pay what he owes them.

Osovitzki writes that his arrest on May 23, 2019 "saved my life" because it was the jolt, he needed to get clean. Osovitzki's uncle, Ornan Sharaby, recalls that when he saw Osovitzki shortly after his arrest, Osovitzki "spilled his heart out" and admitted his drug use, confessing that he was "shocked and sorry for the way he treated people and how aggressive he was at the time, that he was not himself mentally" and that he "realized the damage he ha[d] done to the people that cared for him." Sharaby further writes that Osovitzki later "shared with me a conversation about his support group that he was going to, and the guide at this group ha[d] told him after three months that he does not need to come anymore, but he insisted that he wants to continue coming." Osovitzki successfully completed substance use treatment at Compass Health System in Florida on February 26, 2020 and describes this treatment as the "best thing" he could have done. PSR ¶ 91. As noted in the PSR, continued drug testing since that time confirms that Osovitzki has been and remains clean.

D. Post-Arrest Rehabilitation

Over the last three years, Osovitzki has returned to many of the habits and practices that were important to him, including rededicating himself to his children and trying to repair the damage done to his family. After his arrest, Osovitzki moved in with his parents. Over time, Galia and Yair have come to forgive their son for the personal anguish his actions caused them and the harm inflicted on their business, and they are today important pillars in his life and rehabilitation. Sharon and Osovitzki maintain an excellent co-parenting relationship in spite of their separation. Gradually, Sharon began allowing Tomer to take their two younger children (███████████) out on his own, and Tomer is often invited to join the family for *Shabbat* meals on Friday nights and Saturdays.

Many family members and friends describe their observation of Osovitzki as a parent. His sister in law, Amanda Osovitzki, writes that "[t]he love and support he gives to his family is unmatched." Osovitzki's friend, Amelia Lancaster, writes that "Tomer has such a special bond [] with his four daughters. They're always going to their father first with any concerns—relationships, school, work, health, etc." Daniel and Suzy Elster, friends for over 20 years, write that "Tomer has always been an integral part of his four daughters' lives by providing support, love, and guidance." Moshe Hammer, a long-time family friend, describes Osovitzki as "a very caring and dedicated father to his four beautiful daughters, ever-present in their lives, ready and willing to support them through their struggles and share in their joy." Close friend Yael Emano writes that her kids went to school with the Osovitzki girls, and she observed that Osovitzki was "a very special family man that always showed up at school functions and gave his daughters all the love and attention in the world." Yaniv Sananes, a friend whose children are close with Osovitzki's children, writes that Osovitzki is a "wonderful and very active father" who has taught his children "the proper way of behaving and respecting others."

All four of Osovitzki's daughters, ranging in age from 12-19, have written letters to the Court. Leigh, 19, writes that "my dad is my rock, my shield, my comfort" and recalls that Osovitzki stepped up when the father of a friend died to make sure that Leigh's friend's family was "was taken care of." From that instance and others, Leigh writes that she learned that "when people we care about need our support, we must put everything aside to help in every way possible." Shiri, 18, writes that Osovitzki is "the most amazing dad in the world . . . my rock and my best friend." Even now that she has left the house and moved to Israel, Osovitzki every night sends her "a 'good night, I love you'" text, and "it's so special to me." ▉ 14, writes about the many lessons her father has taught her and remarks that "he is the person I call first thing in the morning," and "I can't go to sleep until I'm sure he's sent me a goodnight message." ▉ 12, is her father's "baby," and she writes that she appreciates her father's help with her homework and when they play games together and that she "wishes every night that my dad will be with me every day."

Several of Osovitzki's daughters' friends describe the way in which Osovitzki has served as father figure to them, as well. Luba Fux, who is now studying to be a doctor, describes dealing when she was young with the loss of her father and her mother contracting brain cancer. "[T]he reason [] I had groceries in my pantry was because of Tomer Osovitzki . . . . I am confident in saying he is a major reason [] I am where I am today." Samantha Rothschild recalls that after Osovitzki's two older daughters, Rothschild's dear friends, had moved away Osovitzki "called me on a Friday night and invited me to dinner at his parents['] house" because "[h]e always wants to make sure everyone feels included." Abraham Lecthman writes that after he had become distant from his own father, Osovitzki "offered immediate support as a male adult figure in my life" and further supported Lechtman when a friend of his died in a car accident by being "there to help me talk through it."

Many family members and friends also describe the way that Osovitzki is giving of his time and energy and devoted to helping those around him. Yarden Sakhai, Sharon's nephew, writes that as a teenager he struggled with shyness and that "Tomer noticed that I was struggling to be part of the conversation" and made sure that during holidays and family meals Yarden was included, taking a step to help him that no one else had done and one that resulted in Yarden's

"overcoming an obstacle that [to] this day helps me in life." Joseph Gayer, a long-time friend of the family, writes that when he "ran into hard times financially" almost a decade ago, Osovitzki gave him an unsolicited loan that he could pay back "whenever you have it." Sharon's mother, Edna Abramov, writes that she "do[es] not forget" Osovitzki's kindness, and the fact that he helped her "without hesitation" when she "got into debt" and routinely shows that he "ha[s] a big heart" by giving to "charities, synagogues, rabbis," and others. Amadeus McCaskill writes that in 2020, he was forced to move his family as the result of being laid off due to the Covid pandemic and that even though "[w]e hadn't known each other [] very long," "Tomer was the only person to ask if he could help" and did in fact help with the move. McCaskill further remembers Osovitzki's "kind words" when McCaskill was "at a very low point . . . ha[ving] recently lost my grandfather." Osovitzki's friend, Amelia Lancaster, writes about how Osovitzki demonstrated "the depth of his concern and compassion for people." When she was involved in a serious car accident Osovitzki, though out of town at the time, ensured that someone be with her and bring her food at the hospital and "helped coordinate travel arrangements for my brother to arrive in Florida and stay with me while I recovered."

Sharon's nephew, Benjamin Sakhai writes that "when I started working on my startup, Tomer had a lot of connections in the tech world [and] went out of his way" to help Sakhai make important professional connections. Sharon's nephew, Daniel Sakhai recalls a time when Osovitzki was picking him up from basketball practice and saw his friend fall off his bike and "went straight to help him take care of it . . . bought him a soda and gave him a ride home." Graeme Gordon, who is married to Sharon's cousin, writes that in 2014 Osovitzki "took a minority position in my start-up" and "took a strong interest in our progress and was quick to offer feedback when needed." Marcel Matitau, best friend of Galia and Yair, describes how Osovitzki's "positive attitude helped keep us afloat" when Matitau husband was hospitalized for a stroke. Matty Oren, a very close friend, writes that Osovitzki checks in on him on a weekly basis to ensure that "everything is okay." Orna Serruya, a close friend of Osovitzki and Sharon for over fifteen years, writes that her children "adore Tomer like an Uncle," and she recalls the time "he came to pick up my kids from school when I wasn't feeling well and my husband was out of town." Friend and neighbor, Daniel Amuial, writes that "I have personally watched Tomer open his home, family and generosity to all who come his way."

Osovitzki has long been and continues to be an extremely active giver of his time and money to charity. Rabbi Mendel Rosenfeld, one of the community Rabbis in Aventura Florida and a close friend of the family, writes that "Tomer has always been there to help in the community, anytime he had a chance he would offer his assistance whether financially or [] physically help[ing to] deliver[] food to the less fortunate." Rabbi Israel Landan, the director of a community center in Toronto, writes that he "turned to [Osovitzki] frequently with requests for assistance," and Osovitzki responded by "donat[ing] generously to assist the needy anytime I approached him." Rabbi Landan remarks that "there are countless individuals in our community who have unknowingly benefited from Tomer's generosity, yet he never seeks recognition or acclaim for what he does."

Osovitzki is particularly involved in two community charitable organizations, JAFCO and Larger than Life USA, both of which have written letters in support. JAFCO's stated mission is "to provide care, safety and support to children and their families within the Jewish community

and beyond who are impacted by abuse, neglect, trauma, or developmental disabilities, thereby giving every child a place to belong." *See https://www.jafco.org/who-we-are/about/*. JAFCO is an orphanage that takes in children from all walks of life and attempts to "provide a model child welfare program which can be replicated by other communities around the country." *Id.* Larger than Life USA is a nonprofit that writes that it "aims to improve the quality of life for children with cancer" by providing assistance to the children's families and organizing dream trips and activities for the children. Larger Than Life writes that "Tomer Osovitzki and his family have been contributing donors and supporters of our organization since 2012" and specifically notes Osovitzki volunteer work "to assist us every year for the annual Florida [fundraising] gala."

Osovitzki has also worked extensively with the Aleph Institute, a nonprofit organization devoted to alternatives to incarceration and aiding criminal defendants in their rehabilitation. Rabbi Yossi Bryski, Aleph Institute's Director of Alternative Sentencing, has written a detailed letter of the Aleph Institute's work with Osovitzki to further understand and taking responsibility for his actions and work to better himself through counseling and charitable work.[5] Bryski writes that Osovitzki "has begun to internalize why his conduct was so wrong and how he can use the insights he has gained to help others to become a better person. . . . [H]e has re-directed his efforts from the negative behavior that resulted in his conviction towards positive action by helping his community." In addition to citing the work he has done with JAFCO and Larger Than Life, as detailed above, Bryski notes that "[a]fter the collapse of the Champlain Towers in Surfside, Florida, Tomer worked with the Aventura Police Department to provide clothing, food, and water to residents who became homeless" and the work volunteering and packaging meals Osovitzki has done with Feeding South Florida, an innovative food bank that distributed over 146 million meals to 1.4 million people in 2021 alone. Bryski believes that "Tomer is deeply committed to his sobriety, and he realizes that he must remain sober in order to continue on the path of personal growth and rehabilitation that he has already begun."

## DISCUSSION

A. <u>Particular Nature and Circumstances of the Offense</u>

Osovitzki respectfully submits that an examination of the nature and circumstances of his offenses indicate that a sentence well below the applicable Guidelines range is warranted in the instant case. To be sure, the fraud scheme of which he was convicted was a serious offense and defendant fully accepts responsibility for his conduct. However, as the Court compares the fraud in the instant case to other frauds that have been perpetrated in this and other districts mitigating factors come to light and place the Jetlux credit card scheme toward the less serious end of the universe of fraud offenses.

First, unlike many frauds, as stated above and throughout the PSR, the large majority of the funds acquired through Osovitzki's fraudulent conduct were repaid to the individual cardholder victims well before any criminal investigated had commenced. This type of repayment rarely happens in fraud cases. Often the victims are left with nothing, while here most were made whole in short order. In that way, this case is similar to *United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD) (RER) (E.D.N.Y.). In *Zaslavskiy*, a recent case in the Eastern District of New York involving

---

[5] The Aleph Institute's letter in support is attached as Exhibit C.

cryptocurrency, Judge Raymond J. Dearie noted that it was extraordinary that most or all of the victims would be recompensed and therefore sentenced the defendant well below the Guidelines range. The circumstances in the instant case are even more indicative as a ground for a downward variance because unlike in *Zaslavskiy*, where repayment apparently occurred only after the defendant was served with SEC subpoenas, Osovitzki repaid the individual cardholders before criminal prosecution was even contemplated.

American Express is still owed money and Osovitzki fully intends to repay the company after numerous factual issues regarding the amounts due are resolved by the parties.[6] These disputes include several disputed charges that Osovitzki contends were not fraudulent and a number of instances—at least one of which is described in the PSR at ¶¶ 38-44—in which Osovitzki quickly repaid a cardholder whose card he had misused but that cardholder had not alerted American Express and thereby received a windfall in the form of double compensation. Similarly, in a small number of instances, Osovitzki made payments directly to flight operators who successfully convinced American Express to also pay them, thus receiving double payment. Once these issues are resolved, Osovitzki intends to make restitution to American Express.

Relatedly, Osovitzki's repayments to the cardholder demonstrates that the motivation for his fraud was not simply to steal money for personal use, as is the case in most frauds. The money was not systematically depleted for Osovitzki's personal benefit or wasted on providing a sustained extravagant lifestyle. Rather, Osovitzki acted in a desperate attempt to keep his business afloat. He allowed his desire to maintain the viability of his business to lead him to knowing participation in a fraud scheme. Of course, this motivation is not a justification for Osovitzki's actions. He wrongly acted and at times misled victims. However, Osovitzki's motivation does offer the Court some insight into the significant difference between the fraud in this case and many others. The fraud here was not outright theft driven by greed. It was a misguided, and improperly rationalized, attempt to save a business. Although admittedly illegal, as the Court engages in a nuanced evaluation of the nature and circumstances of the offense, Osovitzki respectfully submits that his conduct falls toward the lower end of the universe of fraud offenses and this factor weighs in favor of a downward variance pursuant to the sentencing considerations set forth in 18 U.S.C. § 3553(a).

B. <u>Vagaries of the Fraud Guideline</u>

Another important circumstance of Osovitzki's offense conduct that warrants consideration for a downward variance are the vagaries of the Sentencing Guideline section applicable to fraud offenses, U.S.S.G. § 2B1.1, commonly referred to as the "fraud guideline." The inequities in the mechanical application of the fraud guideline were recognized by the Second Circuit, in *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). In *Algahaim*, the Court agreed with the long-standing criticisms of the fraud guideline finding that the Sentencing Commission, in promulgating Section 2B1.1, "let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range" thereby causing an "unusualness . . . that a sentencing court is

---

[6] For this reason, Osovitzki respectfully requests, with the government's consent, that the determination of the restitution portion of his sentence be adjourned to allow the parties more time to resolve the outstanding issues. To be clear, Osovitzki concedes that the amounts currently contested for restitution purposes are properly included in the agreed upon Guidelines "loss" amount and the proposed forfeiture order.

entitled to consider" in determining the appropriateness of a non-Guidelines sentence. *Id.* While recognizing that the Sentencing Commission was "entitled" to use this approach, the Court expressed its concern regarding this method of calculating an appropriate criminal sentence and noted that it lacked any precedential support. *Id.* In *United States v. Johnson*, No. 16 Cr. 457 (NGG), 2018 U.S. Dist. Lexis 71275, at *11-13 (E.D.N.Y. Apr. 25, 2018) (*available at* https://casetext.com/case/united-states-v-johnson-2478), Judge Nicholas Garaufis of the Eastern District of New York heeded the Second Circuit's admonition, explaining, in part, his rationale for a below-Guidelines sentence for a defendant convicted of a large-scale fraud as follows:

> As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime. It is no wonder that Judge Stefan Underhill, concurring in a recent Second Circuit opinion, called the loss enhancement Guideline "fundamentally flawed, especially as loss amounts climb." *United States v. Corsey, 723 F.3d 366, 380 (2d Cir. 2013)* (Underhill, J., concurring); see also *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission ... effectively guaranteed that many such sentences would be irrational on their face."). Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less solely responsible for a white-collar offender's Guidelines sentence. Accordingly, Judge Underhill opined that, because the loss Guideline "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices ..., district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." See *Corsey*, 723 F.3d at 379 (op. of Underhill, J.). I agree with Judge Underhill and refuse to mechanistically impose such an illogical sentence. That this situation continues unabated is a great shame for the many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.

*Id*.

Osovitzki does not dispute that pursuant to Guidelines §2B1.1, he is legally responsible for $3,250,915.00 of "loss." PSR ¶ 164. However, the application of this loss amount to Osovitzki, which increases his offense level two-fold, clearly implicates the concerns expressed by the Second Circuit in *Algahaim* and Judge Garaufis in *Johnson*. The sixteen loss categories that are set forth in §2B1.1 are not based on any empirical data or any logical policy concerns. This is the exact reason that the Second Circuit identified this bracketing procedure as "unusual." *Id*. The Sentencing Commission has arbitrarily attributed certain loss amounts to trigger an increase in a defendant's offense level. However, these attributions are based on nothing. For example, a fraud that involved more than $6,500 increases the offense level by 2 points, and a loss of over $15,000 increases it by 4 points. Absent is any policy or explanation as to why a difference of $8,500.00 doubles the increase. Equally perplexing is the fact that the next two-point increase does not occur until the fraud causes greater than $40,000 of loss. Thus, when looking consecutively at two of the sixteen "finely calibrated" categories, an $8,500 difference in loss amount has equal

importance and effect as a $25,000 difference. Taking this analysis to the extreme, the difference between a scheme involving a loss amount of $6,500.01 and one involving a loss amount of $15,000.01 is two offense levels. The difference between a scheme involving a loss amount of $250,000,000.01 and one involving a loss amount of $550,000,000.01 is also two offense levels. As a result, a loss increase of $8,500 and $300,000,000 may result in an identical impact on a Guidelines calculation. This incongruity permeates the entire fraud guideline and renders it an impractical means to determine the starting point for the ultimate determination of an individual's proper and just sentence.

Osovitzki respectfully submits that the arbitrariness and unfairness of the fraud guideline is particularly acute in this case and warrants a downward variance. Sixteen points are added to his offense level based solely on the amount of "loss." This increase results in Osovitzki's sentencing range skyrocketing from 0-6 months (base offense level of 7, plus 2 for role and minus 2 for acceptance of responsibility) to 51-63 months. Without any empirical correlation to his actual conduct, Osovitzki's exposure mechanically, and very significantly, increased. As discussed above, the financial aspects of Osovitzki's crime are quite unique. This circumstance was noted by Probation within its justification for recommending a below the Guidelines sentence for Osovitzki, by stating, "Lastly, and most notably, we considered defendant's efforts to repay some of the victims prior to the initiation of the offense investigation."

As noted in the above discussion, the Guidelines take no account of the fact that Osovitzki intended to repay and did in fact repay many of the victims in this case. Nor do the Guidelines consider the reasoning and intention behind Osovitzki's actions, misguided and wrongful as that reasoning may have been. Nor do the Guidelines account for the fact that Osovitzki did not personally enrich himself through his scheme or that he is now subject to a forfeiture order entirely divorced from any personal gain from the scheme. In other words, the Guidelines calculations, which Osovitzki accepts as correctly calculated, treat Osovitzki in the same manner as one who fraudulently stole from victims for no other reasons than personal greed, squandering the money in the process with no intention of ever making repayment, such that the victims were forever harmed. As the Supreme Court noted in its holding in *United States v. Booker*, 543 U.S. 220, 264 (2005), that the interest in "certainty and fairness . . . while avoiding unwarranted sentencing disparities and maintaining sufficient flexibility to permit individualized sentences when warranted" espoused by Congress in enacting the Guidelines would be preserved by making the Guidelines advisory is apparent in this case. Osovitzki submits that a downward variance from the Guidelines is fair because of the unique circumstances of this case and the consequent need for an individualized sentence.

## **CONCLUSION**

For the above stated reasons, Osovitzki respectfully submits that evaluations of the 18 U.S.C. § 3553(a) factors each taken individually, and with greater impact in the collective, warrants a sentence of time served. Thank you for your Honor's consideration of this letter.

Very truly yours,

*Sanford Talkin*

Sanford Talkin
Noam Greenspan


cc: AUSA Jeffrey Coffman (by ECF)
      AUSA Micah Fergenson (by ECF)