**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**UNITED STATES OF AMERICA**                :

    **- v. -**                                            :

**TOMER OSOVITZKI,**                          :                          **19 Cr. 794 (KPF)**

              **Defendant.**      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM
### REGARDING DEFENDANT TOMER OSOVITZKI

 

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America

JEFFREY C. COFFMAN
Assistant United States Attorney
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | |
|  | : | 19 Cr. 794 (KPF) |
| TOMER OSOVITZKI, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT TOMER OSOVITZKI

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Tomer Osovitzki ("Osovitzki" or the "defendant"), which is scheduled for January 4, 2023, at 3:00 p.m.   For over 18 months, Osovitzki led a conspiracy to defraud dozens of victims of more than $3.2 million.   His victims included American Express, customers of his private charter flight brokerage company, private charter flight companies, and other merchants.   Osovitzki's requested sentence of time served (approximately twelve days) would fail to serve the essential sentencing goals of reflecting the seriousness of Osovitzki's offense conduct, affording general deterrence, and promoting respect for the law.   For the reasons stated below, the Government respectfully submits that the defendant's serious criminal conduct warrants a substantial term of imprisonment.

I.    **Factual Background**

A. **Osovitzki's Offense Conduct**

As set forth in the Presentence Investigation Report ("PSR"), Osovitzki was the founder and owner of Jetlux, Inc., a private charter flight brokerage business.   (PSR ¶ 12).   From March 2017 through March 2018, Osovitzki and co-conspirator Isis Marie Capre Franceshi ("Franceshi"),

acting at Osovitzki's direction, engaged in a scheme to defraud Jetlux's customers, vendors, and American Express ("Amex") by (1) presenting fictitious Amex credit card authorization codes to private charter flight companies and other merchants in order to obtain flights and other items under the false pretense that Amex had approved the transactions and would pay what initially appeared to be declined charges made to credit cards presented by Osovitzki (the "Force-Post Transactions"); and (2) using credit card account numbers of Jetlux customers, without authorization, to pay for flights for other Jetlux customers and Osvitzki himself (the Unauthorized Card Transactions").   (PSR ¶¶ 12-44).   Osovitzki is responsible for a loss of $3,250,915.   (PSR ¶ 55).

The Amex credit cards Osovitzki used for the Force-Post Transactions were in Osovitzki's name, his wife's name, and his mother's name.   (PSR ¶¶ 16-32).   At the time he provided the fictitious authorization codes for these cards to merchants, Osovitzki knew the credit card accounts did not have sufficient available credit for the transactions or had been cancelled by Amex due to returned payments or credit concerns.   (*Id.*).   In many instances, Amex reimbursed its cardholders – Jetlux customers whose cards Osovitzki had used without authorization for Unauthorized Card Transactions.   In other instances, Amex paid vendors for Force-Post Transactions relating to flights the vendors had provided for Jetlux.   In many other instances, when Osovitzki's customers complained about Amex's ultimate declination of the charges, Osovitzki continued to deceive them, including by concocting a story that Jetlux was unable to pay for the transactions because one of its employees, Franceshi, had stolen funds from the company.   Osovitzki told victims that he had fired Franceshi, but in reality he had her adopt the use of aliases, including Camilla Febus, so that she could continue to communicate with customers, principally by email, and participate in the fraud.   (*E.g.,* PSR ¶¶ 25-29).

### B.  Procedural History

On May 10, 2019, Paul E. Davison, United States Magistrate for the Southern District of New York, issued a warrant for Osovitzki's arrest on the basis of a criminal complaint charging him with wire fraud, in violation of 18 U.S.C. § 1343, and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).

Osovitzki was arrested in the Southern District of Florida on May 23, 2019, was released on bond, and made his initial appearance in this District on July 15, 2019, at which time he was not ordered detained.

On November 7, 2019, a Superseding Indictment was filed in this District charging Osovitzki with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One), wire fraud, in violation of 18 U.S.C. § 1343 (Count Two), and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) (Count Three).   (Dkt. No. 21).

On June 23, 2022, pursuant to a plea agreement, Osovitzki pleaded guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, as charged in Count One of the Superseding Indictment.

### C.  Loss, Restitution, and Forfeiture

In the plea agreement, Osovitzki agreed that the loss amount is $3,250,915.   (PSR ¶ 7(c)). He has also agreed to make restitution to his victims in an amount ordered by the Court in accordance with Title 18, United States Code, Section 3663A.   As Osovitzki states in his sentencing submission, the parties have not reached agreement on the amount of restitution owed to some victims, and request that the Court defer its determination of this issue to permit the parties additional time to attempt to reach an agreement.   (Def.'s Sent. Mem. at 12).   In particular, the parties have not yet reached agreement on the amount of restitution due to Amex,

the victim that suffered the greatest loss.   The Government has forwarded to Osovitzki affidavits and supporting documentation provided by Amex, including a supplemental affidavit received on December 28, 2022.   The Government anticipates that the parties will either submit a jointly agreed-upon proposed restitution order, or submit additional briefing and request that the Court set a date for the final determination of the victims' losses within 90 days after sentencing, pursuant to 18 U.S.C. § 3664(d)(5).

Also pursuant to the plea agreement, Osovitzki has admitted to the forfeiture allegation with respect to Count One of the Superseding Indictment, and agreed to a forfeiture money judgment in the amount of $3,120,996.[1]   (PSR ¶ 121).

### D.  Sentencing Guidelines Range and the Recommendation of the Probation Office

Consistent with the parties' stipulations in the plea agreement, the PSR calculates an applicable Guidelines range of 51 to 63 months' imprisonment, based on a total offense level of 24 and a Criminal History Category of I.   (PSR ¶¶ 107-108).   The offense level of 33 is calculated as follows:

- A base offense level of 7, pursuant to U.S.S.G. §§2X1.1(a)(1) and 2B1.1(a)(1) (PSR ¶ 54);

- A 16-level increase, based on a loss of more than $3,250,915, pursuant to U.S.S.G. §2B1.1(b)(1)(I), (PSR ¶ 55);

---

[1]  The forfeiture amount is slightly lower than the Guidelines loss amount of $3,250,915 due to a small number of attempted fraudulent Amex transactions Osovitzki attempted to process through his parents' company.   Because these transactions were reversed and not paid by Amex, and no services were provided by any vendor in connection with the transactions, they did not result in Osovitzki's receipt of fraud proceeds.

- A 2-level increase because the offense involved ten or more victims, pursuant to U.S.S.G. §2B1.1(b)(2)(A)(i), (PSR ¶ 27);

- A 2-level increase because the defendant was an organizer, leader, manager, or supervisor in the criminal activity, pursuant to U.S.S.G. §3B1.1(c), (PSR ¶ 58); and

- A 3-level reduction for acceptance of responsibility, pursuant to U.S.S.G. §3E1.1 (PSR ¶¶ 62-63).

The Probation Office recommends a sentence of 24 months' imprisonment, explaining as follows:

> The fraud committed is significant, considering the substantial loss amount and the number of victims impacted. We believe these aggravating factors calls for a term of incarceration which will hold the defendant accountable for his actions. Notwithstanding, and without diminishing the seriousness of the offense, we also identified several mitigating factors. Firstly, the defendant is a first-time, non-violent offender who appears to have been otherwise law-abiding. Secondly, we considered the defendant's familial ties and responsibilities. Thirdly, we factored the defendant's substance use issues that appeared to have influenced his conduct in the offense. Fourthly, we took into account the defendant's acceptance of responsibility via his guilty plea. Lastly, and most notably, we considered the defendant's efforts to repay some of the victims prior to the initiation of the offense's investigation.

(PSR at 28). For the reasons discussed in detail below, the Government respectfully submits that Osovitzki's more than 18-month leadership of a conspiracy to defraud dozens of victims of more than $3.2 million warrants the Court's imposition of a substantial term of imprisonment, including that recommended by the probation office, and that the time served sentence Osovitzki requests would not adequately serve the legitimate purposes of sentencing.

## II. <u>Sentencing Legal Principles</u>

The Guidelines are no longer mandatory, but they continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar

ways." *United States v. Booker*, 543 U.S. 220, 252 (2005); *see also United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker*/*Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

### III.   Section 3553(a) Analysis

The Government respectfully submits that a substantial term of imprisonment is necessary to reflect the seriousness and aggravated nature of Osovitzki's offense conduct, afford general deterrence, and promote respect for the law.

### A.  Nature and Circumstances of the Offense

The nature of this offense is fraud and deceit.   After participating in the operation of his parents' large, successful travel business for two decades, Osovitzki began his own venture, Jetlux. When Jetlux began to fail, Osovitzki refused to accept the consequences –reputational, financial, or otherwise – and instead repeatedly deceived and defrauded his customers, vendors, and Amex. Osovitzki repaid many of his victims, in full or in part, while his scheme was still underway, in what may fairly be described as a "robbing Peter to pay Paul" scenario, after victims complained or threatened legal action or law enforcement notification.   It may well be that he planned to ultimately make his business successful and repay all of his victims, as he claims in his sentencing submission.   Yet Osovitzk's intentions to lie to his victims in order to steal their money or services until he could acquire sufficient funds to repay them does not distinguish him from many others convicted of fraud offenses.

Osovitzki's illegal actions were not the result of a momentary lapse in judgment.   To the extent his fraudulent scheme was aberrant behavior when it began, it ceased to be so when he continued it for over 18 months and directed his employee, Franceshi to do so.   Even now, although Osovitzki has repaid many of his victims, others continue to remain unreimbursed for tens of thousands, hundreds of thousands, and in the case of American Express, more than $1 million in losses.   Osovitzki's prolonged and serious criminal conduct warrants a substantial term of imprisonment.

On the other hand, to Osovitzki's credit, even after his arrest he has continued to repay, or arrange for his family to repay on his behalf, a number of his victims, as he notes in his sentencing submission.   Indeed, the Government understands that one victim charter flight company was repaid in full for its $39,100 just this week.   In addition, Osovitzki has accepted responsibility for his conduct and entered a plea of guilty well in advance of trial.   The Court's sentence should, of course, take into account Osovitzki's recent decisions and conduct in this regard.

## B. History and Characteristics of the Defendant

Osovitzki is 45 years old with no prior criminal convictions.   He grew up in a middle-class family in Toronto, lived in Israel for a time, and became a naturalized U.S. citizen who lived in Florida at the time of the offense conduct.   His sentencing submission and attached letters in support are replete with examples of his generous and laudable conduct towards those he cares about, including family and friends.   As compared to many defendants who appear before this Court, Osovitzki has enjoyed great financial success.   He worked for two decades at the successful travel company he helped his parents to build, from which he spun off Jetlux.   He possessed the family structure, intelligence, and other natural abilities and skills to achieve success, generate substantial revenue, and employ and supervise others.   But he operated Jetlux as an essentially fraudulent enterprise through which he stole from clients, Vendors, and Amex again and again in order to continue to operate and live well.   Although he reports in his sentencing papers that he sold off certain luxury assets in order to pay some of his victims, at the time of his May 2019 arrest, while many of his victims remained unpaid, Osovitzki was found living in a luxury apartment in a building on a private island in Aventura, Florida, separate from his wife and children, who continue to live in the family home with substantial equity.   (PSR ¶ 100).   The apartment in which he was living was most recently listed for rent at more than $13,000 per month.

8

Osovitzki has submitted a substantial number of letters from his friends and family members and from those whom he has helped in the past.   These letters describe numerous positive things Osovitzki has done, and the Court should factor them into its sentence.   Yet, the Government submits that they should not be as significant in determining Osovitzki's sentence as he suggests.   The Government does not question that Osovitzki is well-liked and thoughtful towards his family, friends, and community, or that the letters reflect his other positive qualities and charitable contributions.   Nor does the Government dispute that over the course of his successful life, Osovitzki has used some of his wealth and time to help others.   But, while admirable, this does not set him apart from many other similarly situated white-collar defendants—individuals who, although high-achieving and successful in their fields, nonetheless choose to steal and defraud, and to hide that side of themselves from family and friends, as Osovitzki did.   Courts recognize that it is the norm for professionally successful defendants to be involved in charitable works.   *See, e.g., United States v. Barbera*, 2005 WL 2709112 at * 12-13 (S.D.N.Y. 2005) (citing *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) (community involvement not out of the ordinary for high ranking businessmen; "[l]ikewise, excellent character references are not out of the ordinary [for white collar defendant]; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her")); *United States v. Kolbach*, 38 F.3d 832, 838 (6th Cir. 1994) ("it is *usual* and *ordinary*, in the prosecution of white-collar crimes involving high-ranking corporate executives . . . to find that a defendant was involved as a leader in community charities . . . and church efforts" (emphasis in original)); *United States v. Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) ("high-level business executives . . . enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities").

9

To the extent that Osovitzki suggests that his loss of financial and reputational standing as a result of his conviction warrants a lighter sentence, this claim should be rejected.   Any notion that highly successful white-collar criminals should be sentenced more lightly than defendants of a lower socioeconomic status cannot be countenanced.   "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life.   '[N]one of these things are [his] sentence.   Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)); *United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). And, as the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized.   Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.   It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class.   But in this instance we must fight our nature.   Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

10

### C.  The Need to Afford Adequate Deterrence

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).   General deterrence is critical in cases like this given the substantial financial incentive that exists to generate money through fraud.   Many businesses struggle.   Were fraud of this nature to be excused on the basis of a need to continue business operations, the message sent to the public would be destructive.

Osovitzki requests a sentence of time served – approximately 12 days.   The Government respectfully submits that such a sentence would not only fail to reflect the seriousness of Osovitzki's crime, but also fail entirely to serve the goal of general deterrence.   The message that would be sent to others by such a sentence is that a multi-million dollar fraud involving the dozens of victims is, essentially, not worthy of punishment at all.   Such a sentence would incentivize other would-be fraudsters—the reward is high, the likelihood of being caught and successfully prosecuted is uncertain, and the punishment in the unlikely event of a successful prosecution is minimal.   Respectfully, that is *not* the message that this Court should send to the public through its sentence of Osovitzki.

The Government respectfully submits that, in this case, an analysis of the Section 3553(a) factors requires a substantial term of imprisonment to appropriately reflect the serious and prolonged nature of Osovitzki's crimes, achieve general deterrence, and promote respect for the law.

### IV.    The Fraud Guideline

Osovitzki argues that U.S.S.G. §2B1.1(b)(1)'s sixteen loss categories are without empirical basis and that "the arbitrariness and unfairness of the fraud guideline is particularly acute in this

case and warrants a downward variance." (Def.s' Sent. Mem. at 14). The Court may, of course, vary downward from the Guidelines Range in light of the statutory sentencing factors of 18 U.S.C. § 3553 or on grounds of the Court's reasoned policy disagreement with the application of the Sentencing Guidelines. *See, e.g., United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016); *United States v. Bonilla*, 618 F.3d 102, 110 (2d Cir. 2010). It is also true that the cutoff amounts set forth in §2B1.1's loss table are a human creation and might have been set differently. At the same time, the "nature and circumstances" of a fraud scheme, and the degree of need for deterrence, both specific and general, are affected in great measure by the extent of the harm caused or intended to be caused to the fraud scheme's victims. Osovitzki did not engage in a single fraudulent $100 credit card transaction, or a couple of fraudulent $1,000 credit card transactions, or a few fraudulent $10,000 credit card transactions, or several $100,000 credit card transactions. Each of these would have been meaningfully different offenses that caused or were intended to cause different degrees of harm, and to generate different amounts of proceeds (*i.e.*, incentive) to others who might engage in similar conduct. And each would merit a lesser sentence than Osovitki's offense, everything else being equal. It is entirely appropriate that the Guidelines reflect an increased Guidelines range in this case, where Osovitzki engaged in dozens of fraudulent transactions involving dozens of victims, with a corresponding loss of more than $3.2 million.

## V.   <u>Conclusion</u>

On the facts of this case, a substantial term of imprisonment is appropriate and just. Such a sentence would reflect the seriousness of Osovitzki's crime and send a message to others that a substantial jail term is the likely consequence of such criminal conduct. By contrast, a sentence involving minimal or no prison time would be perceived by the public as a slap on the wrist and would fail to deter anyone from flouting the law and engaging in significant fraud over a

prolonged period.   Accordingly, the Government respectfully requests that the Court impose a

substantial term of imprisonment.


Dated:  New York, New York
        December 29, 2022

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney

                          By:       _____
                                    Jeffrey C. Coffman
                                    Assistant United States Attorney