UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                -v.-<br><br>TOMER OSOVITZKI,<br><br>               Defendant. | 19 Cr. 794-2 (KPF)<br><br>**ORDER** |

KATHERINE POLK FAILLA, District Judge:

This Order resolves an outstanding issue between the parties concerning the appropriate restitution figure to be assessed against Defendant Tomer Osovitzki. After multiple meet-and-confers, the parties have advised the Court that they are in agreement as to Mr. Osovitzki's restitution figure with respect to $998,717.75, reflecting losses suffered by six victims, and are in disagreement with respect to $413,234.81, reflecting additional losses suffered by one of the six victims (the "Disputed Amount"). Accordingly, this Order focuses on the Disputed Amount, ultimately concluding that the Amount is properly assessed against Mr. Osovitzki under the relevant restitution statutes, including the Mandatory Victims Restitution Act (the "MVRA"), 18 U.S.C. § 3663A.

## BACKGROUND

### A. The Offense Conduct

The Court draws the offense conduct summary from Mr. Osovitzki's Presentence Investigation Report ("PSR" (Dkt. #122)); the defense did not object to the facts contained in the PSR at his sentencing, and those facts were adopted by the Court (Sentencing Transcript (Dkt. #134) at 10, 13). Mr.

Osovitzki was the founder and owner of Jetlux, Inc., a private charter flight brokerage business.  (PSR ¶ 12).  From March 2017 through March 2018, Mr. Osovitzki and his employee and co-defendant, Isis Marie Capre Franceshi, engaged in a scheme to defraud Jetlux's customers, vendors, and at least one credit card company in two different ways: (i) by presenting fictitious credit card authorization codes to private charter flight companies and other merchants in order to obtain flights and other items under the false pretense that the credit card company had approved the transactions and would pay what initially appeared to be declined charges made to credit cards presented by Mr. Osovitzki (the "Force-Post Transactions"); and (ii) by using credit card account numbers of Jetlux customers, without authorization, to pay for flights for other Jetlux customers and Mr. Osovitzki himself (the Unauthorized Card Transactions").  (*Id.* ¶¶ 12-44).

The victim who suffered the greatest losses as a consequence of Mr. Osovitzki's scheme was American Express ("Amex").  Mr. Osovitzki used Amex credit cards in the names of himself, his wife, and his mother in order to effectuate the Force-Post Transactions.  (PSR ¶¶ 16-32).  At the time he provided the fictitious authorization codes for these cards to merchants, Mr. Osovitzki knew the credit card accounts did not have sufficient available credit for the transactions or had been cancelled by Amex due to returned payments or credit concerns.  (*Id.*).  Separately, Mr. Osovitzki made unauthorized charges using the Amex cards of several of his customers.  (*See, e.g.*, *id.* ¶¶ 33-44).  In many instances, Amex reimbursed its cardholders, *e.g.*, Jetlux customers

2

whose cards Mr. Osovitzki had used for the Unauthorized Card Transactions. In other instances, Amex paid vendors and service providers directly for the flights and services that had been provided to Jetlux and/or its customers.

## B.     The Indictment, the Guilty Plea, and Sentencing

Mr. Osovitzki was charged in a three-count superseding indictment, S1 19 Cr. 794 (the "Indictment"), with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; the substantive offense of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2.  (Dkt. #21).  After several delays that were partially attributable to the ongoing COVID-19 pandemic, Mr. Osovitzki pleaded guilty on June 23, 2022, pursuant to a plea agreement with the Government, to the wire fraud conspiracy charged in Count One.  (PSR ¶ 7 (outlining plea agreement)).  Among other provisions, Mr. Osovitzki agreed to forfeit a sum of $3,120,996, and to make restitution in an amount to be determined by the Court.

During the plea proceeding, Mr. Osovitzki again agreed to make restitution as ordered by the Court.  (Plea Transcript (Dkt. #113) at 26).  As part of his plea colloquy, Mr. Osovitzki admitted to injuring Amex directly in the course of perpetrating his fraudulent scheme:

> From approximately 2017 to 2019, I agreed with another person to make false statements to credit card companies and other businesses in order to obtain services and goods from those companies.  As part of this scheme, I or the person I agreed with would present the Amex to businesses that I knew would not be authorized to negotiate the transaction I was attempting to execute.  However,  by  providing  a  fictitious

3

> authorization code to the merchants, we were able to
> override the declination of the use of the credit cards
> and have the credit card transactions completed based
> on the false information[] provided to the merchants.
>
> I am aware, and do not dispute, the credit card company
> that was defrauded is located in New York, New York,
> and that many of the wire communications regarding
> these transactions flowed through New York, New York.

(*Id.* at 31-32).  At the conclusion of the proceeding, the Court accepted Mr.

Osovitzki's guilty plea.  (*Id.* at 35).

Sentencing took place on January 4, 2023, during which the Court

sentenced Mr. Osovitzki principally to a term of 18 months' imprisonment.

(Dkt. #134; *see also* Dkt. #129 (judgment)).  At the start of the proceeding, the

parties discussed with the Court their preference that the setting of a

restitution figure be deferred pursuant to 18 U.S.C. § 3664(d)(5).  (Dkt. #134 at

4-9).  The Court granted the parties' request; it deferred restitution, while

ordering forfeiture in the amount of $3,120,996.  (*Id.* at 51).

## C.    The Instant Restitution Dispute

The Court understands that the parties have been in extended

discussions concerning the appropriate restitution figure in this case.  After

sentencing, the parties continued to meet and confer before advising the Court

with respect to the degree to which they could agree on a figure.  (*See, e.g.*,

Dkt. #133, 136 (status letters); *see also* Dkt. #140 ("Gov't Br."), 143 ("Def.

Opp."), 144 ("Gov't Reply")).  From the last of these submissions, the Court

understands that the parties are in agreement with respect to the majority of

the restitution sought, as evidenced by the following table provided by the Government:

| Victim | Government's Position | Osovitzki's Position | Difference |
|---|---|---|---|
| American Express | $772,478.92 | $359,244.11 | $413,234.81 |
| Victim-2 | $50,646.33 | $50,646.33 | $0 |
| Victim-3 | $262,075.28 | $262,075.28 | $0 |
| Victim-4 | $100,836.78 | $100,836.78 | $0 |
| Victim-5 | $63,180.00 | $63,180.00 | $0 |
| Victim-6 | $162,735.25 | $162,735.25 | $0 |
| **TOTAL** | **$1,411,952.56** | **$998,717.75** | **$413,234.81** |

(Gov't Reply 1).

The Disputed Amount reflects Amex losses attributable to unauthorized charter flights that were charged by or at the behest of Mr. Osovitzki to a single cardholder's corporate Amex account. According to Deborah L. Simoncini, a Senior Special Agent for Amex, Amex credited a cardholder (the "cardholder" or "R.F.") who claimed fraud, in or about February 2018, for "unknown charter flights in the total amount of $667,733.27." The amount of charges contested by the cardholder was later offset by the cardholder's receipt of reimbursements in the amount of $254,498.46 from Mr. Osovitzki that "were not correlated to specific transactions." (Simoncini Decl. ¶¶ 6-10). In consequence, Amex is out the $413,234.81 it paid to the charter companies. In support of the claimed loss, Simoncini supplied a spreadsheet that listed dates, amounts, and internal Amex transaction ID numbers for the charges at issue; an invoice from a third-party airplane charter company; and a summary chart from Amex's Worldwide Fraud Information System. (*Id.*, Tab A-1, Ex. B-C).

The nub of the dispute between the parties concerns whether Amex qualifies for reimbursement of these charges under the federal restitution statutes. Mr. Osovitzki proceeds from the factual premise, not disputed by the Government, that

> [b]etween February 5, 2018, and March 5, 2018, Osovitzki wired the cardholder and the cardholder's company over $1.2 million, far in excess of the unauthorized transactions. *See* PSR ¶ 35. Some of those wires were attributed to specific flights while others were provided as general compensation. The cardholder and the cardholder's company apparently failed to disclose to Amex that they had received repayment from Osovitzki, thereby obtaining a substantial windfall. *Id.* Had they disclosed this information and/or allowed American Express to keep the charged on the card, all parties would have been made whole on or about March 2018. *Id.*

(Def. Opp. 6-7). From this, Mr. Osovitzki reasons that Amex is not a victim, but rather is a third-party provider of compensation; as such, Amex is not entitled to recovery of the Disputed Amount from him in the form of restitution, but would instead have to pursue claims against the cardholder. (*Id.*). Separately, Mr. Osovitzki claims that Amex provides insufficient substantiation for the Disputed Amount. (*Id.* at 7). The Government responds that Amex is a direct victim of the fraudulent scheme to which Mr. Osovitzki pleaded guilty, and is entitled to restitution of the Disputed Amount under the MVRA. (Gov't Reply 2-4).

## DISCUSSION

### A.    Applicable Law

Under the MVRA, the "court shall order" a defendant convicted of "an offense against property under" Title 18, "including any offense committed by fraud or deceit," to pay restitution to "an identifiable victim or victims" who "ha[ve] suffered a ... pecuniary loss."  18 U.S.C. § 3663A(a)(1), (c)(1).  The Second Circuit has made clear that "[t]he 'primary and overarching goal of the MVRA is to make victims of crime whole' to 'compensate these victims for their losses and to restore the[m] to their original state of well-being.'"  *United States* v. *Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) (alteration in original) (quoting *United States* v. *Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011)).

The MVRA defines "victim" to include:

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern[.]

18 U.S.C. § 3663A(a)(2); *cf. United States* v. *Perez*, No. 22-1547, 2023 WL 8800722, at *3 (2d Cir. Dec. 20, 2023) (acknowledging that conspiracy may result in "multiple victims" entitled to restitution (internal quotation marks and citation omitted)).

The Government bears the burden of demonstrating by a preponderance of the evidence the amount of the loss sustained by a victim as a result of the offense.  18 U.S.C. § 3664(e); *United States* v. *Reifler*, 446 F.3d 65, 113 (2d Cir.

2006)).  "The purpose of restitution is to compensate victims for their losses,"
and so restitution must be ordered "in the full amount of, but not in excess of,
his, her, or its loss."  *United States* v. *Gonzalez*, 647 F.3d 41, 65, 67 (2d Cir.
2011).  Eschewing "mathematical[] preci[sion]" or a "one-size-fits-all" standard
of precision, the Second Circuit has instead instructed district courts that the
MVRA "requires only reasonable approximation of losses supported by a sound
methodology."  *United States* v. *Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013).

If a victim's losses are not ascertainable by the date that is 10 days prior
to sentencing, the court must set a date for the final determination of the
victim's losses, which must occur no later than 90 days after sentencing.  18
U.S.C. § 3664(d)(5).  That said, the Supreme Court has held that "a sentencing
court that misses the 90-day deadline nonetheless retains the power to order
restitution — at least where, as here, the sentencing court made clear prior to
the deadline's expiration that it would order restitution, leaving open (for more
than 90 days) only the amount."  *Dolan* v. *United States*, 560 U.S. 605, 608
(2010); *see also Gushlak*, 728 F.3d at 192 (affirming restitution order issued
eighteen months after sentencing absent evidence of prejudice to defendant).
The Second Circuit has similarly declined to reverse a restitution order because
of a district court's failure to determine restitution within 90 days in the
absence of a defense showing of actual prejudice.  *See, e.g.*, *United States* v.
*Avenatti*, 81 F.4th 171, 203-05 (2d Cir. 2023), *cert. denied*, No. 23-6753, 2024
WL 2709455 (U.S. May 28, 2024).

B.    **Analysis**

From the record before it — which includes the PSR, the parties' sentencing submissions, and the submissions in connection with this dispute — the Court finds that: (i) Mr. Osovitzki caused the charter flight charges underlying the Disputed Amount to be posted to RF's corporate Amex account; (ii) Mr. Osovitzki paid some portion of the Disputed Amount directly to RF or RF's company; (iii) RF contested the charges to Amex as fraudulent; and (iv) Amex "credited the Card Member for the entire fraud amount," thus paying the charter flight providers itself.  Because both parties source their arguments to *United States* v. *Thompson*, 792 F.3d 273 (2d Cir. 2015), this Court now focuses on that decision.

Defendant Jamie Gene Thompson, a serial fraudster, was employed as a home-care attendant, and later a live-in caretaker, for Liddell and Albert Eardensohn.  Over time, the Eardensohns came to learn that Thompson had defrauded them of tens of thousands of dollars, by means of unauthorized withdrawals from the Eardensohns' investment account at Wells Fargo, unauthorized checks cashed against their checking account at TD Bank, and fraudulent charges on their Citibank credit card.  *Thompson*, 792 F.3d at 275. Once discovered, Thompson confessed to the fraud, begged the Eardensohns not to press charges, and sent them two checks in the approximate amount of $30,400.  *Id.*

Thompson was charged in a one-count indictment with access device fraud, in violation of 18 U.S.C. § 1029(a)(2).  As part of his plea agreement with

the Government, he agreed to pay restitution to the Eardensohns for all losses
resulting from his crime. *Thompson*, 792 F.3d at 275.  At Thompson's
sentencing, the parties calculated the actual losses to the Eardensohns to be
$65,143.47, comprising "$46,308.47 stolen from the Eardensohns' Wells Fargo
investment account, $1,815.50 cashed from their TD Bank checking account,
$9,516.50 charged to their Citibank card, and $7,503 in compensable
attorneys' fees." *Id.*  Of note, however, Citibank and Wells Fargo (together, the
"Banks") had previously undertaken efforts to make the Eardensohns whole,
which efforts had involved Citibank forgiving $9,516.50 in credit card charges
and Wells Fargo reimbursing the Eardensohns for $33,767.97 in unauthorized
withdrawals.  *Id.* at 276.

As a practical matter, once the Banks' accommodations were taken into
account, Thompson's checks to the Eardensohns exceeded the losses that the
couple themselves had actually suffered.  However, the district court declined
to use that overage to offset the losses suffered by the Banks, and similarly
declined to use the overage to reduce Thompson's restitution figure.
*Thompson*, 792 F.3d at 276.  The Second Circuit reversed, reasoning that
"[b]ecause the MVRA limits a defendant's restitution amount to the actual
losses suffered by his victims, and because third-party providers of
compensation do not qualify as 'victims' whose losses may expand the
defendant's restitution liability, the district court erred in ordering Thompson
to pay more in restitution than the victims' actual losses."  *Id.* at 275.

In arriving at those conclusions, the Second Circuit focused on who qualified as "victims" under the relevant restitution statutes, which it divided into "substantive" and "procedural" components:

> Section 3663A, the substantive component, provides that a district court "sentencing a defendant convicted of an offense described in subsection (c) ... shall order ... that the defendant make restitution to the victim of the offense." *Id.* § 3663A(a)(1). As that language suggests, "[o]nly a 'victim' (or the victim's estate) is entitled to restitution" under the MVRA. *United States* v. *Maynard*, 743 F.3d 374, 378 (2d Cir. 2014). A "victim" for the purposes of the statute is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). In restricting its definition of "victim" to persons proximately harmed by the defendant's acts, the MVRA aims to limit restitution to those harms that "ha[ve] a sufficiently close connection to the conduct at issue." *Robers* v. *United States*, — U.S. —, 134 S.Ct. 1854, 1859, 188 L.Ed.2d 885 (2014) (internal quotation marks omitted). Accordingly, we have recognized that § 3663A(a)(2)'s definition of "victim" governs "the calculation of [the] reimbursable loss" itself. *Maynard*, 743 F.3d at 378; *see also United States* v. *Gushlak*, 728 F.3d 184, 194-95 (2d Cir. 2013).

*Thompson*, 792 F.3d at 277. This "substantive component" was distinguished from the procedural restitution provisions contained in 18 U.S.C. § 3664; the latter, the Court found, did "not ... impose any independent restitution obligations on a defendant but simply ... set the procedures by which the sentencing court imposes [the] restitution order calculated." *Id.* at 278 (internal quotation marks and citation omitted).

From this statutory analysis, the Court reasoned that "third-party providers of compensation are not themselves 'victims' for the purposes of the MVRA, [and] any losses suffered by those parties in the course of compensating

a victim cannot increase a district court's calculation of the defendant's restitution obligations under § 3663A(b)." *Thompson*, 792 F.3d at 279. What is more, the Court found that to require Thompson to pay a restitution figure to the Banks that did not reflect Thompson's prior payments to the Eardensohns would contravene these statutes, by making Thompson pay more to third parties than he could have been ordered to pay to his original victims. The Second Circuit remanded the case back to the district court with instructions to limit the restitution figure by netting out the overage that Thompson had returned to the Eardensohns, and then divide the revised figure *pro rata* between the Banks. *Id.* at 281.[1]

As just noted, the key holdings of *Thompson* are that (i) restitution is limited to actual losses suffered by qualifying victims and (ii) third-party payors not impacted directly by the underlying offense conduct do not qualify as "victims" under the relevant restitution statutes. Both of those points counsel in favor of finding Amex to be a qualifying "victim." Amex was the "Credit Card Company" referenced in the Indictment as one of the direct victims of the charged fraudulent scheme, and Mr. Osovitzki similarly referenced Amex during his guilty plea allocution as "the credit card company that was defrauded." (*See, e.g.*, Dkt. #21 at ¶ 2; Dkt. #113 at 32). More importantly, the

---

[1]    To the extent the excess payments to the Eardensohns could be viewed as a windfall to them, the Second Circuit recognized that the couple could not be compelled in the criminal case to pay over any of the funds they had received to the Banks. *See United States* v. *Thompson*, 792 F.3d 273, 280 (2d Cir. 2015) (citing 18 U.S.C. § 3664(g)(1)). Instead, the Banks would have to pursue any claims against the Eardensohns under state law. *Id.*

12

factual recitation in the PSR that the Court adopted without objection from the parties makes clear that *Amex* was the victim of Mr. Osovitzki's unauthorized uses of R.F.'s corporate card:

> Because some these transactions were not authorized by [the company], *American Express bore the losses.* As of March 2018, Jetlux had paid American Express approximately $254,000 for these unauthorized transactions. Beginning in February 2018, OSOVITZKI began making payments to [the company] for these unauthorized charges. As of March 2018, OSOVITZKI had paid [the company] over $1.2 million by wire, far in excess of the unauthorized transactions. [The company] failed to disclose to American Express that it had received repayment from OSOVITZKI. Thus, [the company] was left with a substantial windfall and *American Express suffered a loss.* Had [the company] disclosed this information and/or allowed American Express to keep the charges on the card, all parties would have been made whole by March 2018.

(PSR ¶ 35 (emphases added)).

The MVRA defines "victim" to include "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3553A(a)(2). Amex was directly and proximately harmed by Mr. Osovitzki's unauthorized uses of R.F.'s Amex card in the course of his fraudulent scheme, as the grand jury found and as Mr. Osovitzki admitted. Further, contrary to the intimations in Mr. Osovitzki's submission (*see* Def. Opp. 5-7), the losses attributed to these unauthorized transactions have been adequately substantiated by Ms. Simoncini's declaration and exhibits, in the

amount of $413,234.81. Accordingly, Amex qualifies as a victim under the relevant statutes, and is entitled to receive the Disputed Amount from Mr. Osovitzki as restitution. *Cf. United States* v. *Williams*, 811 F. App'x 690, 691 (2d Cir. 2020) (summary order) (upholding restitution award to credit card company in the amount of account balance charged off as result of defendant's false claims of identity theft).

Mr. Osovitzki's arguments to the contrary are unavailing. First, he chides the Government for arguing that "because Amex was a victim in this case, it must have been the victim in every transaction involving one of its credit cards." (Def. Opp. 2). The Court did not understand the Government to be making a *per se* argument of this type, but rather to be arguing — as the record supports — that Amex was a qualifying victim regarding both the Force-Post Transactions and the Unauthorized Card Transactions, and, by extension, the R.F. transactions at issue. Next, Mr. Osovitzki argues that the Government fails to "describe the way Amex was the victim in any of the disputed transactions." (*Id.* at 4 (emphasis omitted)). The Court again finds to the contrary. In its opening submission, the Government argued that Amex "was the primary victim of Osovitzki's scheme, and is itself a 'victim' under the MVRA" (Gov't Br. 5); that this case differed from *Thompson* insofar as "nearly all of the fraudulent transactions that comprised Osovitzki's scheme involved his misuse of Amex credit cards" (*id.*); and that "Osovitzki's scheme revolved entirely around credit cards issued by a single financial institution [Amex] … which he used for more than 150 fraudulent transactions over a period of more

than 18 months" (*id.* at 6).  In its reply submission, the Government clarified

that Amex itself had been defrauded by Mr. Osovitzki's scheme, in that each of

the R.F. transactions "was a fraudulent representation to Amex that the

cardholder had authorized the charge."  (Gov't Reply 2).[2]

Mr. Osovitzki contends that "[t]he language of the MVRA, which

repeatedly speaks about 'the victim' in the singular, is clear that there can only

be one victim regarding each transaction or loss amount."  (Def. Opp. 4).  But

his argument is disproved by the statute itself, which (i) recites its applicability

to convictions for certain specified offenses "in which an identifiable victim *or*

*victims* has suffered a physical injury or pecuniary loss," 18 U.S.C.

§ 3663A(c)(1)(B) (emphasis added); (ii) provides that a court can refrain from

applying its provisions where, among other situations, the court finds that "the

---

[2]     *See also* Gov't Reply 2-3:

> As set forth in the Indictment and PSR, Osovitzki engaged in
> scheme to defraud Amex and others, including by using Amex
> credit cards without the cardholders' authorization.  Amex paid
> merchants for charges to the cards. Amex was not a third-party
> provider of compensation — it was the initial, direct, and primary
> victim of Osovitzki's scheme.  When cardholders reported to Amex
> that they had not authorized the charges, Amex often reversed
> them and suffered the sole loss.  In the case of the cardholder and
> transactions at issue in Tab A-1, although the charges were
> incurred between April and October 2017, (Amex Aff., Ex A, Tab A-
> 1), it was not until the cardholder reported the fraud to Amex in
> February 2018, (Amex Aff. ¶ 7), that Osovitzki made payments to
> the cardholder, (Def.'s Ltr. at 6).  The reason is plain: he waited
> until the cardholder became aware of the fraudulent charges and
> reported them to Amex.  Because Amex credited the cardholder for
> the fraudulent charges, Osovitzki's payments to the cardholder
> resulted in, if not a windfall to the cardholder, at least an offset of
> other amounts Osovitzki owed the cardholder.  But it was Amex —
> not the cardholders — who paid the merchants on the basis of the
> fraudulent transactions.  And it was Amex who was left to bear the
> loss.

number of identifiable victims is so large as to make restitution impracticable" (thereby presuming multiple-victim cases where restitution is practicable), *id.* § 3663A(c)(3)(A); and (iii) extends victim status in cases involving a scheme, conspiracy, or pattern of criminal activity to "*any* person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern," *id.* § 3663A(a)(2) (emphasis added). Indeed, the *Thompson* decision on which Mr. Osovitzki relies, with its two victims, further refutes his argument. Even if, counterfactually, the law required the Court to determine a single victim of the unauthorized transactions underlying the Disputed Amount, that victim would be Amex.

The Court acknowledges that, prior to his indictment in this case, Mr. Osovitzki transferred funds to R.F. and R.F.'s company potentially in excess of their actual losses. It remains the case, however, that this Court had not then determined the appropriate restitution figures for each of Mr. Osovitzki's victims. In consequence, though Mr. Osovitzki may have chosen to pay (or overpay) one of his putative victims before his arrest, this Court did not order him to pay more to R.F. in restitution than R.F.'s actual losses (and certainly did not order him to pay more to Amex than its actual losses), and thus the overpayment concern articulated in *Thompson* is not met. Conversely, the Court here has found that Amex is a victim of Mr. Osovitzki's fraud entitled to restitution in the Disputed Amount, and the law does not require (indeed, it does not permit) Amex to receive less than that amount because Mr. Osovitzki chose to give more money to a different victim, nor does it require that Amex

16

pursue its restitution figure from R.F.  The MVRA is explicit in requiring "the defendant [to] make restitution to the victim of the offense."  18 U.S.C. § 3663A(a)(1).[3]

## CONCLUSION

Ultimately, Mr. Osovitzki's arguments prove too much.  While there are situations in which a credit card company is not directly implicated by a fraudulent scheme, this was not such a case.  Amex was the principal target of Mr. Osovitzki's scheme, and it was directly and proximately harmed by both components of that scheme, including the unauthorized transactions underlying the Disputed Amount.  Amex is a qualifying victim under the MVRA, and it is entitled to the full amount of the losses it has proven.

For the foregoing reasons, the Court concludes that the Disputed Amount should be imposed as a restitution obligation against Mr. Osovitzki and in favor of Amex.  The Government is directed to prepare a proposed restitution order in accordance with this Order, and to submit the proposed order to the Court on or before **August 29, 2024.**

---

[3]    This case evidences the competing policies sought to be vindicated by the restitution laws, the primary goal of which, as noted, is "to make victims of crime whole."  *United States* v. *Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006) (quoting *United States* v. *Simmonds*, 235 F.3d 826, 831 (3d Cir. 2000)).  The Court certainly does not want to disincentivize defendants from reimbursing their victims prior to a restitution order being entered.  That said, it is incumbent on such defendants to ensure that they are paying the correct loss amounts to the correct victims.  To adopt Mr. Osovitzki's arguments here would enshrine a perverse result in this and other multi-victim cases, where victims would be forced to pursue the restitution to which they are entitled under the MVRA from other victims in separate proceedings outside of the criminal case.

SO ORDERED.

Dated:  August 8, 2024
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge